**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00104-CV**
_____

**IN THE INTEREST OF O.D. & A.D.-A.**

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 20-08-09148-CV**

**MEMORANDUM OPINION**

The Texas Department of Family and Protective Services ("the Department") initiated suit to involuntarily terminate Father's parental rights to his children, "Oliver" and "Alex" based on Texas Family Code subsections 161.001(b)(1)(D) and (E). [1] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D) and (E). Maternal grandfather intervened ("Intervenor") and requested that he be named the children's conservator. Following a jury trial, the trial court terminated Father's parental rights to his

---

[1] In parental rights termination cases, to protect the identity of the minors, we refer to the children and their family members by a pseudonym or initials. *See* Tex. R. App. P. 9.8(b)(2).

children, based on subsections (D) and (E) and a finding that termination was in Oliver and Alex's best interest.[2] *See id.* § 161.001(b)(1)(D) and (E), (b)(2). When asked who should be the conservator between the Intervenor and the Department, the jury found the Department should be named as permanent managing conservator for both children. Father and Intervenor appealed.

In three issues, Father contends: (1) the trial court erred in denying his Motion for New Trial based on improper jury argument; (2) the trial court erred in granting Intervenor's Motion for Leave to File Second Amended Petition in Intervention at the time of trial; and (3) the trial court's Order of Termination is void, because the trial court failed to make the requisite findings under Texas Family Code section 263.401 in two extension orders.[3] Intervenor contends that two of the trial court's orders were void, because it failed to make the requisite findings per Texas Family Code section 263.401 in its extension orders; therefore, the orders extending the dismissal date were not valid, and the case was automatically dismissed. Prior to this appeal Appellants never moved for an extension pursuant to or citing section 263.401 or complained about the absence of the "extraordinary circumstances" or

---

[2]The trial court terminated Mother's rights, but she is not a party to this appeal.
[3]Father adopted Intervenor's briefing on the extension issues. *See* Tex. R. App. P. 9.7 (permitting parties to adopt briefing of other parties in whole or part on appeal).

"best interest" findings. As discussed more fully below, we affirm the trial court's judgment.

## I. Background and Facts Leading to Removal

The Affidavit in Support of Removal stated that in August 2020, four-month-old Alex presented to Texas Children's Hospital ("TCH") in the Woodlands with significant injuries, including bilateral subdural hematomas (brain bleeds), multiple broken ribs in various stages of healing, and retinal hemorrhages in both eyes. Medical providers suspected non-accidental trauma and potential child abuse. Mother's recited history did not correlate to Alex's injuries. Alex was transferred to TCH's main campus in the Medical Center because he needed more intensive treatment and further testing. TCH's Child Abuse Pediatric ("CAP") Team became involved, and after running multiple tests, determined Alex's injuries were consistent with child abuse and having been shaken. Accordingly, the Department filed its Petition, sought removal, termination, and conservatorship of Alex and his older brother, Oliver. Mother ultimately signed an Affidavit of Voluntary Relinquishment as to both children.

## II. Jurisdiction

Appellants contend the trial court's extension orders on July 27, 2021, and October 8, 2021, failed to contain the requisite findings pursuant to section 263.401, thus invalidating the extensions, and therefore, the case was automatically dismissed

which made the trial court's termination order void.[4] Intervenor acknowledges, as he must, that the first extension constituted a "covid extension." Because Intervenor and Father argue this issue impacts jurisdiction, we address it first.

## A. Procedural Background

On August 3, 2020, the Department filed its Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship, and the trial court signed an Order appointing the Department as Temporary Managing Conservator the same day, which started the clock for the one-year dismissal deadline. *See id*. § 263.401(a). After a full adversary hearing, the trial court signed Orders noting an August 5, 2021 dismissal date and June 23, 2021 trial date.[5] In May 2021, Intervenor filed his Petition in Intervention and two Motions for Continuance and Extension of Dismissal Date. These Motions for Continuance and Extension of Dismissal Date did not cite to section 263.401 as the basis for requesting the extension nor did it argue "extraordinary circumstances" existed. *See id*. § 263.401(b). Intervenor submitted a proposed order, which the trial court did not

---

[4]Father adopted Intervenor's briefing regarding the extensions and jurisdictional issues.

[5]Our calculations show that the actual dismissal date in this case would have been August 9, 2021; however, that four-day distinction makes no difference to the result of this case. So, for the purpose of our analysis, we will use the date contained in the clerk's record.

sign. However, the clerk's record reveals the original trial date was moved to July 27, 2021.

On July 27, 2021, counsel appeared and announced ready for trial. The reporter's record indicates that Father was not transported to the courthouse from jail, despite an advanced request. After discussion, the parties agreed to reset the matter to August 16, 2021, and the trial court announced, "I'm going to exten[d] it under the most recent emergency order. So I'll just extend it. Six-month extension." Before the hearing concluded, given the unavailability of certain witnesses for the first reset date, the trial court reset the matter to August 31, 2021. No written order was signed at the time of this extension, but 180 days from the original dismissal date would have made the extended dismissal deadline February 1, 2022. A notation on the docket sheet for July 27 also indicates the case was extended.

The record also contains an Order Granting Extension signed October 8, 2021, and the Order contained the following language:

> Pursuant to the Texas Supreme Court Order authorizing extensions for Covid, the Court finds that, after considering the facts and evidence of this matter, circumstances necessitate the children, [Oliver] and [Alex], remain in the temporary managing conservatorship of the Texas Department of Family and Protective Services, (the "Department"), and that continuing the appointment of the Department as temporary managing conservator is in the best interest of the children.

This Order noted a dismissal date of February 1, 2022, and a trial date of January 24, 2022. Appellants contend this Order likewise does not contain the requisite

5

"extraordinary circumstances" finding, and nonetheless, it was signed after the first dismissal date expired. Ultimately, Appellants contend that because the trial court's oral extension did not contain the requisite findings and a subsequent written order was not signed until after the August dismissal date, the trial court had already lost jurisdiction and could not revive it. However, it should again be noted that at no time prior to the appeal did Appellants ever move for an extension pursuant to or citing section 263.401 or complain about the absence of the "extraordinary circumstances" or "best interest" findings.

**B. General Law in Termination Cases**

The Family Code requires a court to commence trial on the merits by the first Monday after the first anniversary of the date the court renders a temporary order appointing the Department temporary managing conservator or the court's jurisdiction is terminated and the suit is automatically dismissed without a court order. *See id.* § 263.401(a). Under section 263.401, a trial court may not retain the suit on its docket beyond the time described unless "the court finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." *Id.* § 263.401(b). If the court makes those findings, it may retain the matter on its docket for a period not to exceed 180 days. *Id.* Also pertinent to this inquiry is Family

6

Code section 101.026, which allows trial courts to render orders by pronouncing its ruling orally in the presence of the court reporter or in writing on its docket sheet or by separate written instrument. *See id*. § 101.026; *Interest of G.X.H.*, 627 S.W.3d 288, 299 (Tex. 2021) (noting rule and stating it applies to a trial court's findings under section 263.401).

## C. Emergency COVID-19 Orders and Applicability to this Proceeding

During the COVID-19 pandemic, the Texas Supreme Court issued multiple Emergency Orders that impacted how courts managed cases and provided for the retention of termination cases on their dockets. This series of Emergency Orders in response to the COVID-19 pandemic "permitted trial courts to suspend the deadlines and procedures in Section 263.401." *C.C. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-21-00587-CV, 2022 WL 1121428, at *2 (Tex. App.—Austin Apr. 15, 2022, no pet.) (mem. op.) (citations omitted).

Appellants acknowledge the initial extension on July 27, 2021, was a COVID extension yet argue the trial court's oral order did not include the requisite findings required by section 263.401(b). They further contend the *Twenty-Ninth Emergency Order* applied. *See Twenty-Ninth Emergency Order Regarding the Covid-19 State of Disaster*, 629 S.W.3d 863, 863–64 (Tex. 2021). However, at the time the trial court orally rendered the extension, the Texas Supreme Court's *Thirty-Eighth*

7

*Emergency Order* was in place.[6] *See Thirty-Eighth Emergency Order Regarding the COVID-19 State of Disaster*, 629 S.W.3d 900, 900–01 at ¶15 (Tex. 2021) (noting effective dates of May 26 to August 1, 2021).[7] This distinction is significant.

Beginning with the *Eighteenth Emergency Order*, the Supreme Court required initial extensions of the dismissal date "in all proceedings" under Subtitle E, Title 5 of the Family Code comply with section 263.401, whereas prior orders did not. *See Eighteenth Emergency Order Regarding the COVID-19 State of Disaster*, 609 S.W.3d 122, 122–23 (Tex. 2020); *C.C.*, 2022 WL 1121428, at *3. Specifically, the *Eighteenth Emergency Order* provided:

> b. *in all proceedings* under Subtitle E, Title 5 of the Family Code:
>
> > (i) extend the initial dismissal date as calculated under Section 263.401(a) *only as provided by Section 263.401(b) or (b-1)*;
> >
> > (ii) for any case previously retained on the court's docket pursuant to Section 263.401(b) or (b-1), or for any case whose dismissal date was previously modified under an Emergency Order of this Court related to COVID-19, extend the dismissal for an additional period not to exceed 180 days from the date of this Order[.]

---

[6] Intervenor's brief acknowledges the trial court orally rendered this extension on July 27, 2021, and that the *Twenty-Ninth Emergency Order* expired on February 1, 2021.

[7] The *Fortieth Emergency Order* entered on July 19, 2021 did not go into effect until August 1, 2021. *See Fortieth Emergency Order Regarding the COVID-19 State of Disaster*, 629 S.W.3d 911, 913 ¶8 (Tex. 2021) (noting effective date of August 1, 2021).

*See Eighteenth Emergency Order*, 609 S.W.3d at 122–23, ¶3(b) (emphasis added).

This continued until the *Thirty-Eighth Emergency Order*, which limited the requirement that extensions of the initial dismissal date under the current *Emergency Order* "only as provided by Section 263.401(b) or (b-1)" to actions filed on or after May 26, 2021. *See Thirty-Eighth Emergency Order Regarding the COVID-19 State of Disaster*, 629 S.W.3d 900, 900–01 at ¶4 (Tex. 2021) (effective May 26 through August 1, 2021). The *Thirty-Eighth Emergency Order* provided in pertinent part

> 4. In any proceeding under Subtitle E, Title 5 of the Family Code, all deadlines and procedures must not be modified or suspended, unless permitted by statute, after August 1, 2021, except the dismissal date may be extended as follows:
>
> > a. for any such proceeding that, on the date of this Order, has a dismissal date that was previously modified under a prior Emergency Order Regarding the COVID-19 State of Disaster, the court may extend the dismissal date for a stated period ending no later than December 1, 2021;
> >
> > b. for any such proceeding that, on the date of this Order, has been previously retained on the court's docket pursuant only to Section 263.401(b) or (b-1), the court may extend the dismissal date for a stated period ending no later than February 1, 2022;
> >
> > c. for any such proceeding that, on the date of this Order, has not been previously retained on the court's docket pursuant to Section 263.401(b) or (b-1), the court may extend the initial dismissal date as calculated under Section 263.401(a) for a stated period ending no later than April 1, 2022; or
> >
> > d. for any such proceeding that is *filed on or after the date of this Order*, the court may extend the initial dismissal date as calculated under Section 263.401(a) *only as provided by Section 263.401(b) or (b-1)*.

*Id.* (emphasis added). As of May 26, 2021, this case had not been previously retained on the docket pursuant to section 263.401(b) or (b-1), therefore paragraph 4(c) applied. *See id.* Although paragraph 4(c) contained language incorporating section 263.401 in the calculation of the dismissal date, it did not include language that allowed for an extension "only as provided by Section 263.401(b) or (b-1)." *Id.* ¶4(c). Paragraph 4(d), however, contained such language and only applied to proceedings "filed on or after May 26, 2021." *Id.* at ¶4(d).

The *Thirty-Eighth Emergency Order* did not necessitate the findings of "extraordinary circumstances" and "best interest" pursuant to section 263.401 when it granted the initial extension of the dismissal date, only that the calculation of dates be consistent with 263.401 and could not end later than April 1, 2022. *See id.*; *see also* Tex. Fam. Code Ann. § 263.401(b). On July 27, 2021, the trial court properly granted an extension of the dismissal date to February 1, 2022, pursuant to the *Thirty-Eighth Emergency Order* when it orally pronounced and made a corresponding entry on the docket sheet for a six-month extension.[8] *See Thirty-Eighth Emergency Order Regarding the COVID-19 State of Disaster*, 629 S.W.3d

---

[8]Months later, the trial court noted incorrectly on the record that the original dismissal deadline was July 29, 2021, and the new dismissal deadline was January 25, 2022, seemingly counting the extension from the date of the hearing rather than the initial dismissal date.

at 900–01, ¶4(c); *see also* Tex. Fam. Code Ann. § 101.026; *In re G.X.H.*, 627 S.W.3d at 299.

On October 8, 2021, prior to the expiration of the new dismissal date of February 1, 2022, Intervenor's counsel filed a Motion for Continuance, which noted a new trial setting of January 24, 2022. The trial court signed an Order Granting Extension the same day again noting a dismissal date of February 1, 2022, which did not alter the dismissal date provided by the July 27, 2021, extension. Despite Appellants' complaints regarding this written order, the matter had already effectively been retained on the trial court's docket until February 1, 2022, by the trial court's oral rendition on July 27, 2021, pursuant to the *Thirty-Eighth Emergency Order*.

We would be remiss not to address our recent opinion in *Interest of F.S.*, where we addressed 263.401 and held:

> the findings may be inferred when the record shows a party filed a written motion before the automatic-dismissal deadline, asked the trial court to retain the case on its docket under Family Code section 263.401 because *extraordinary circumstances* and *good cause* required it do so, the trial court orally granted the motion, and the statements made by the court during the hearing support inferring the trial court found the grounds alleged in the motion for extending the automatic-dismissal deadline had merit.

*Interest of F.S.*, No. 09-22-00114-CV, 2022 WL 4371008, at *1 (Tex. App.—Beaumont Sept. 22, 2022, no pet. h.). Key distinctions in that case allowed the court to imply the requisite findings. In the case before us, the trial court expressly stated

11

it granted the extensions pursuant to Emergency Orders rather than 263.401. Whereas, in *Interest of F.S.*, the parties asked the trial court to retain the case on its docket pursuant to section 263.401 and argued "extraordinary circumstances" existed. *See id.* That is not the case here. Intervenor's Motions for Continuance and Extension of Dismissal Date do not mention 263.401 nor do they argue "extraordinary circumstances" existed. Even if we implied such findings, as the Department argues we must, in the matter before us it is a distinction without a difference. Under its theory, the July 27 extension would be valid. We have already concluded as much, although it was done pursuant to an Emergency Order rather than 263.401, and the case's dismissal date was extended to February 1, 2022.

We hold the *Thirty-Eighth Emergency Order* did not require the trial court to make the section 263.401 "extraordinary circumstances" finding prior to granting an extension. We overrule Father and Intervenor's issues pertaining to the trial court's orders of July 27, 2021, and October 8, 2021.[9]

---

[9]As noted, while this case was pending in the trial court, several Texas Supreme Court Emergency Orders that resulted from the COVID-19 pandemic affected the trial court's deadlines, and the trial court granted subsequent extensions pursuant to these Emergency Orders. That said, Father and Intervenor have not complained about the trial court's rulings on the later extensions and for that reason, we have not addressed them in the appeal. *See Interest of F.S.*, No. 09-22-00114-CV, 2022 WL 4371008, at *2 n.9 (Tex. App.—Beaumont Sept. 22, 2022, no pet. h.).

## III. Trial Proceedings and Evidence

### A. Trial Amendment

The day trial began, Intervenor, who had only sought conservatorship, indicated he wished to adopt the Department's pleadings and add termination to his Petition in Intervention. The same day, he requested leave to amend by filing a Motion to Adopt Petitioner's Pleadings Regarding Termination of Parental Rights and his Second Amended Petition in Intervention. The Second Amended Petition in Intervention added D and E termination grounds, which the Department already pleaded. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D) and (E).

Father objected to the amendment, arguing it was untimely and that it failed to subserve presentation of the case per Rule 66. He also objected arguing it asserted a new cause of action, which was prejudicial as a matter of law. Intervenor responded that leave to amend should be freely given, there was no prejudice to Father as the State sought the same thing with termination. Intervenor further noted that despite being a party for a year, Father failed to send him any discovery. Intervenor argued there were no new witnesses or evidence.

The trial court allowed Intervenor's amendment and overruled Father's objections. The trial court indicated the amendment would not change what was in the jury charge. It also explained that Intervenor seeking termination was not a new cause of action in this case, as Father was already responding to the State's

termination. The trial court noted that even if it was a new cause of action, it did not "reshape[] the lawsuit at all" or change what Father was responding to. The trial court further reasoned that given the procedural posture, this was not unanticipated, Father had appointed counsel to defend it, and there was no prejudice.

## B. Testimony and Evidence

### James Dorchak

CPS Investigator James Dorchak testified that the family had a prior history with the Department, stemming from allegations of domestic violence between Father and Mother in 2018, that Father set Intervenor's house on fire, and concerns Oliver may have been in the home at the time. The allegations were ruled out, since they learned the child was not home when the incident occurred. As a result, Mother obtained a protective order. According to Dorchak, the Department closed that case with an order of protection prohibiting Father from accessing the child.

In August 2019, the Department received another report that Mother was no longer being protective of Oliver and allowed Father to access the child. The Department conducted a family team meeting and offered domestic violence services to Mother, and during that investigation, they determined Intervenor could not protect them. The Department offered Family Based Safety Services ("FBSS"), which Mother participated in, but Father did not since he was incarcerated. The

14

Department advised Mother she needed to stay away from Father for the child's safety.

Dorchak testified he became involved with the family on August 2, 2020, when the Department received another intake. At that time, the intake was that Alex had sustained serious bodily injury "including six rib fractures, two subdermal hematomas . . . [c]hild was currently admitted into Texas Children's, and there was [sic] concerns about abuse." He testified he first spoke with Dr. Swabena Sarpong from TCH then to Mother. Dorchak explained that Mother's story changed when they spoke to her, from initially denying that Father knew where she lived to ultimately admitting that Father was in the room where this occurred. Dorchak explained that he did not speak with Father, since he was the alleged perpetrator, so a detective and a special investigator handled his interview. They appointed a special investigator in August 2020 given the serious bodily injury per Department policy.

Dr. Sarpong told them that Alex had x-rays taken about thirty days before, which did not show any rib fractures or other injuries. So, Alex's injuries occurred sometime between mid-July and August 1 and were "in various stages of healing." The disposition from the August 2020 intake was "reason to believe" which was based on information from TCH, the Sheriff's Office, and Special Investigator Oliveri's documentation. Dorchak testified that Alex was the victim of the physical

15

abuse, not Oliver. Dorchak agreed the medical evidence showed Alex was abused but did not indicate who did it.

Dorchak testified that when a parent abuses the other parent but is not physically abusing the child, it still harms the child and explained why. He said the same was true if a parent abused one child; it would negatively impact the non-abused child and their emotional well-being.

During the investigation, Mother recommended Intervenor as a possible placement for the children, but Dorchak learned he had been charged with assault for allegedly hitting Mother. The Department denied placement with Intervenor due to the assault charge.

Dr. Sarpong

Dr. Sarpong is employed by Baylor College of Medicine and works at TCH. He is an associate professor of pediatrics and the medical director of the child head injury program at TCH. Dr. Sarpong is board certified in child abuse pediatrics by the American Board of Pediatric Subspecialties and American Board of Pediatrics. He is a member of the CAP Team. Dr. Sarpong described the CAP process, which included a head-to-toe exam of the child, obtaining a full history from the parents, reviewing x-rays and lab information, requesting any additional testing, reviewing lab tests and information, then reaching a conclusion.

16

Dr. Sarpong treated Alex at TCH and testified that his injuries were "consistent with child physical abuse." Dr. Sarpong based that opinion on Alex's age and the multiple injuries he sustained, and a baby that age would not be able to cause those injuries by himself. Dr. Sarpong discussed the tests they performed and described Alex's injuries in detail, including subdural hematomas, lung injuries and areas indicative of chest compression, rib fractures that were at least two weeks old, and hemorrhaging in the back of both eyes near the retinas. He explained that for those injuries to occur in the eye, it meant there was a back-and-forth type motion that could occur when someone shook the baby or if the patient had been in a "very-high impact motor vehicle accident." He also explained that there was bleeding in the brain bilaterally, some newer bleeding and some older.

Dr. Sarpong testified it was important to determine if there had been accidents in the past that could explain the injuries. He and his team ruled out a fall or car accident as potential causes of Alex's injuries. Dr. Sarpong noted that a simple fall would not account for these injuries, particularly the amount of bleeding on the brain. He said the injuries were inconsistent with a car accident as well. Nothing he reviewed provided a plausible explanation for these injuries.

Dr. Sarpong explained since some of the injuries were healing, that meant the child was a victim of abuse not once, but multiple times. Dr. Sarpong could not say how long the abuse had been happening but could tell some rib fractures were more

17

than two weeks old, and the brain bleeding and eye bleeding were likely new injuries that happened around the same time the child felt very sick. He also discussed Alex's history of other medical problems but indicated they were not "substantial."

With respect to long-term ramifications for Alex, Dr. Sarpong testified,

> So the long-term implications of this head injury would be developmental delay. Developmental delay meaning some of the kids would – especially in the brain -- would have problems with speech, with walking, with talking. And so those are some of the things that are long-term. The other issue is that we normally -- we would follow these kids up for a very long period of time because what we also know is that when some of these kids start getting to school, they have problems with behavior. They could have problems with solving complex problems as well. So we normally do follow these kids for very long period of time. And so those are some of the long-term problems that you could have with these children.

Dr. Sarpong continues to follow Alex and saw him in clinic about a month before trial. He testified Alex still needs occupational therapy and speech therapy but recently graduated from physical therapy.

Detective Michael Lee

Lee is a major crimes detective with the Montgomery County Sheriff's Office, child abuse unit. Lee was the detective who handled the investigation into Alex's injuries. He, Dorchak, and Special Investigator Oliveri were present and spoke with medical staff at TCH, then interviewed Mother. Lee said they first tried to establish who had access to Alex and whether there was a plausible explanation for the injuries. Lee testified that Mother's story changed from her initial claim that she was

18

the only person to have access to him to ultimately admitting she was cohabitating with Father and had been since Alex's birth.

Shortly after arriving at the hospital, he learned about Father's criminal history and that there was a protective order in place. Within a couple of days, Mother reached out and said she had not been completely honest, so they made an appointment to interview her again. When they spoke with Mother again, Father had already been arrested for violating the protective order. Lee testified that Mother told them she would not defend Father, she had been the victim of domestic violence, and she observed him do some things to the kids that did not seem right which she chastised him about. Lee said Mother described Father punching Alex in the ribs and spinning him around by the "scruff" of his neck and had her demonstrate those things on a doll in the interview. Mother told Lee that Father did not like being around Alex because he cried often, and Father doubted his paternity.

According to Lee, Mother reported Father did it and gave a very plausible explanation that she witnessed the abuse. Mother did not accept responsibility for Alex's injuries but indicated she should have been more protective. Lee did not believe Mother was blaming Father for something she did. During the first interview, investigators approached it as if Mother was the abuser but did not see any indicators of that. Lee testified that Mother lied a lot but seemed to protect Father and not want them to know they lived together because of the protective order. Lee believed that

Mother was a victim of domestic violence. Lee testified they spoke with Intervenor, who was familiar with the domestic violence and relationship.

Lee said they also interviewed Father in the Harris County Jail. Lee testified that Father took responsibility for causing Alex's injuries and claimed it was something he had done by accident when he was playing with the child and described the type of play he claimed caused the injuries. Father complained the baby would not stop crying when he took care of him and claimed the baby had "anger problems." Lee concluded at the end of the investigation that "there was ample evidence to believe [Father] had abused the child and caused those injuries[.]"According to Lee, two people said Father was responsible for the injuries, and Father was one of them. They determined there was probable cause sufficient to bring charges against Father for injury to a child, and they filed a formal complaint.

Lee explained that the medical evidence alone would not tell them whether it was Mother or Father who caused the injury; they had to weigh that evidence against the statements given. Lee testified that Father never told him he intentionally harmed Alex, but Father implied he knew with certainty he caused Alex's injuries. Lee agreed Mother lied during initial interviews and that she lied a lot.

Myrissa Hutchison

Hutchison testified she is employed by the Department as a CPS caseworker and has been assigned to this case for a year and a half. She said the children are in

a foster home and doing very well. Hutchison testified that physically, Alex is doing well and hitting most of his milestones but is a little behind with speaking. There are no current health issues with him that they are worried about. She testified Alex would require physical therapy, possibly occupational therapy, and speech therapy plus he had ongoing neurology appointments.

Hutchison expressed concerns over Oliver's speech delay, which may be made worse by a "tongue tie" and require a medical procedure. There is also concern that Oliver may be on the autism spectrum, which will require further evaluation when he turns four. Hutchison testified there were never any allegations Father abused Oliver.

Hutchison explained that a parent's criminal history is a concern because it could show behaviors that endanger children. Hutchison testified they also consider protective orders, because there has been an act or circumstance putting the children at risk. Hutchison explained that Father's criminal history involved domestic violence and injury to a family member, which is concerning because children who witness that can be affected emotionally as it can cause anxiety. The abuse impacts the physically injured child and children who are around when it occurs. Hutchison testified that when she visited Father in jail, he seemed most interested in Oliver and did not seem to have as much of a bond with Alex.

<u>Father's Testimony</u>

Father testified that Oliver and Alex are his children. He said he began living with Mother and the children in early 2020 and lived there when Alex was born. They all shared a one-bedroom apartment and slept in the same room. Father's brother also lived with them, and he did not work, so he was home most of the time. Father testified he helped change Alex's diapers, but only after a couple of minutes, Alex would get "very fussy." Father testified that he was bonded to his children and loved them.

Father testified that on the morning of August 1, Alex started crying in his crib. Mother was still in bed, so he picked up Alex and started playing with him, but when he would not stop crying, Father gave him to Mother. Father said as he walked out of the room, Mother said Alex was not breathing. Father testified he examined Alex to see what was wrong and called 9-1-1, but they put him on hold while Mother sat there not doing anything. He did not notice the baby had difficulty breathing until Mother said something, then he called 9-1-1 immediately. In certain areas, he felt Mother was a bad mom but did not have concerns about leaving both children alone with her. Father testified that nobody told him that any of Alex's injuries occurred on August 1.

Father testified the children are doing great in foster care, and he did not want them to be removed from foster care or to change their placement. Father explained

22

why he did not want his rights terminated and felt he could support his children in ways others could not, because he had been through the system. Father asked that the jury award custody to the Department.

Father described his relationship with Mother as "bumpy" and "distrustful." According to Father, Mother had a problem with honesty. Father testified he and Mother smoked "weed" together after Alex's birth. He denied he assaulted Mother and testified Intervenor did not like him. Father attempted to explain the assault charge against Intervenor and testified that he broke into Intervenor's home to look for medical records.

Father testified he agreed to the interview with Detective Lee but denied he told Lee that he abused Alex. Father explained that he had not spoken with the doctor or hospital at the time of the interview, only Mother, who just told him Alex's ribs were bruised. Father said he told Lee that he was playing with the baby and had thrown him in the air and caught him on his side, but Lee said that was not enough to cause his injuries; he said the detective took his words out of context. Father confirmed he told Lee that he felt Alex had anger issues. Father said he did not know if he caused Alex's injuries. Father testified that in the weeks leading up to the incident, he noticed blood in Alex's eye and asked Mother about it, but she responded the baby must have burst a blood vessel from crying too hard.

Father said he had been diagnosed with oppositional defiant disorder, bipolar disorder, and depression and used to take medications for them but does not currently. Father testified the worst thing is his son is injured, nobody really knew who the perpetrator was, and he is being blamed.

Debbie Hamilton

Hamilton was the guardian ad litem and CASA for the children. Hamilton was first assigned the case in August 2020. She visited Alex at TCH and described his injuries. She testified he cried as if he were in pain, so she picked him up and rocked him for several hours. The family had been excluded from the hospital room at that time. Hamilton explained that Alex remained in the hospital for about seven days. She also discussed the medical appointments she attended with the children. Hamilton met with Father in jail, and he told her he loved his children and would not give them up.

Hamilton testified that based on her research, she believed Detective Lee. She said she did not feel that the children should be tethered to Father and did not believe Grandfather should have any rights. She testified that various family members had multiple opportunities to protect the children which did not happen, and the children have been through so much trauma, they need a stable home that "untethers them from this family." Hamilton explained it was in the children's best interest to be adopted, and they deserve a stable, loving home prepared to care for their special

needs, which is one of the reasons she was asking the judge to terminate both parents' rights.

### Other Witnesses

Additional witnesses included Father's foster mother and his sister, who provided limited testimony about his relationships with Mother and the children. The contractor who performed Intervenor's home study also described her concerns with placing the children with Intervenor. Intervenor's girlfriend testified about the preparations they made in their home for the children and that they were willing and able to care for them.[10] Intervenor's girlfriend also described Father assaulting Intervenor and how Father set their home on fire.

### Additional Evidence

Additional evidence admitted at trial included, among other things, Alex's medical records from TCH, Mother's Affidavit of Voluntary Relinquishment, copies of judgments of Father's criminal convictions, copies of the protective orders against Father, the indictment against Father for injury to a child, and a copy of the home study.

## C. Jury Arguments

At trial, Father testified he was not asking for custody of the children, but he did not want his rights terminated. Throughout arguments Father used sports as an

---

[10]Intervenor became ill during trial and could not testify.

analogy for termination, arguing that even if he was sitting on the bench, he did not want to be cut from the team. During closing, the children's attorney ad litem argued that Alex had a progressive brain injury and referenced infamous athletes, likening the injuries to football player Aaron Hernandez. Father did not object to these arguments during trial but filed a Motion for New Trial generically complaining of "incurable jury argument."

## IV. Analysis

### A. Motion for New Trial

In Father's first issue, he contends that the trial court erred in denying his Motion for New Trial based on improper jury argument. Specifically, Father complains that the children's attorney ad litem made improper jury argument during closing. Father did not object to the arguments during trial but contends they were incurable.

We review a trial court's denial of a motion for new trial for an abuse of discretion. *See Dolgencorp of Tex., Inc. v. Lerma*, 288 S.W.3d 922, 926 (Tex. 2009).

On appeal, Father complains about the following specific arguments:

> It's really nice that [Father] likes basketball, but you know who will never play basketball? [Alex] because he has abusive head trauma. And we know from the NFL and we know from movies like Concussion and from the doctors like Dr. Sarpong that brain injuries are a degenerative progressive disease. If he's hit in the head with a baseball, if he has full-contact sports, he's set on a new path. A path that this man [Appellant] started. A path that could lead this child to where he's [Appellant's] going to sit in August [jail or prison].

> [B]ut abusive head trauma and Aaron Hernandez starts murdering people, that's easy to understand. It is. I mean, and that's the path that [Father and Mother] have put these children on because Detective Lee said and so did Myrissa that child abuse writes on the fabric of who these children are.
>
> . . .
>
> But [Father] is the monster in all of their lives.
>
> . . .
>
> And just like this progressive brain disease that [Alex] now will suffer with for his entire life . . . .
>
> . . .
>
> They need somebody who's going to be ahead of these little things that are going to come up for them because of these—of this brain injury and because of [Oliver's] autism but it's not—it's not the grandfather.
>
> . . .
>
> [Father] wants a seat on a bench at a game that his child can't play because of his actions.

Father did not object to these remarks during closing or request a limiting instruction. Father's Motion for New Trial contained one sentence that there "was an incurable jury argument not otherwise ruled on by the trial court" but did not identify any statements that he contended constituted improper argument. The Motion for New Trial did not specify whether the objectionable comments occurred during opening or closing or who made the statements. The first time he identified the complained of statements with any particularity was during the hearing on the Motion for New Trial. During the hearing, Father's counsel complained about statements the

27

children's attorney ad litem made during closing. Specifically, he complained about her references to individuals with abusive head trauma, the football player Aaron Hernandez and his conduct following traumatic brain injuries, her claims this was a progressive disease, and her assertions this was the path the parents set Alex on.

Complaints of improper jury argument must typically be preserved by timely objection and request for an instruction that the jury disregard the improper remark. *See* Tex. R. App. P. 33.1; *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009). However, a complaint of incurable argument may be asserted and preserved in a motion for new trial, even absent a complaint and ruling during trial. *See* Tex. R. Civ. P. 324(b)(5); *Phillips*, 288 S.W.3d at 883. Rule 324 of the Texas Rules of Civil Procedure requires that as a prerequisite to presenting such a complaint on appeal, a party must file a motion for new trial where the complaint is incurable jury argument not otherwise ruled on by the trial court. Tex. R. Civ. P. 324(b)(5).

Texas Rule of Civil Procedure 321 provides,

Each point relied upon in a motion for new trial or in arrest of judgment shall briefly refer to that part of the ruling of the court, charge given to the jury, or charge refused, admission or rejection of evidence, or other proceedings which are designated to be complained of, in such a way that the objection can be clearly identified and understood by the court.

Tex. R. Civ. P. 321. Further, Rule 322 states that generalities are to be avoided. *See id.* 322. To preserve this complaint requires a written motion delineating the objectionable arguments with a certain amount of specificity. *See, e.g., Austin v.*

28

*Shampine*, 948 S.W.2d 900, 906 (Tex. App.—Texarkana 1997, writ withdrawn) (noting that where only complaint of incurable jury argument in motion for new trial was description of parties as "corrupt" appellant waived any complaint concerning other jury arguments); *Ruder v. Jordan*, No. 05-16-00742-CV, 2018 WL 627091, at *8 (Tex. App.—Dallas Feb. 2, 2018, no pet.) (mem. op.) (concluding specific instance of improper argument not raised in motion for new trial was not preserved); *Williams v. United Elec. Co-op Servs., Inc.*, No. 10–13–00020–CV, 2014 WL 5801509, at *2 (Tex. App.—Waco Nov. 6, 2014, pet. denied) (mem. op.) (concluding only argument quoted in motion for new trial was preserved and other specific instances of alleged incurable jury argument were not preserved where they were not included in a motion for new trial). In his Motion for New Trial, Father did not identify the objectionable arguments. He failed to identify to the trial court which party or parties made improper argument or whether it occurred during opening, closing, or both. *See* Tex. R. Civ. P. 321, 322, 324(b)(5).

Even assuming Father preserved this issue for our review by orally identifying the statements in the hearing on the Motion for New Trial, after a careful review of the record, we conclude Father failed to meet his burden of showing the arguments could not have been cured with an instruction. The Texas Supreme Court has explained

> In the case of improper jury argument, the complainant must prove a number of things. He has the burden to prove (1) an error (2) that was

29

not invited or provoked, (3) that was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial, and (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the judge. There are only rare instances of incurable harm from improper argument. The complainant has the further burden to prove (5) that the argument by its nature, degree and extent constituted reversibly harmful error. How long the argument continued, whether it was repeated or abandoned and whether there was cumulative error are proper inquiries. All of the evidence must be closely examined to determine (6) the argument's probable effect on a material finding. (7) Importantly, a reversal must come from an evaluation of the whole case, which begins with the voir dire and ends with the closing argument. The record may show that the cause is weak, strong, or very close. From all of these factors, the complainant must show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence.

*Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839–840 (Tex. 1979) (internal citation omitted).

"Incurable jury argument is rare, however, because '[t]ypically, retraction of the argument or instruction from the court can cure any probable harm ...'" *Phillips*, 288 S.W.3d at 883 (quoting *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008) (per curiam)). A party claiming incurable harm must convince the court that, based on the entire record, "the offensive argument was so extreme that a 'juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument.'" *Id.* (quoting *Goforth v. Alvey*, 271 S.W.2d 404, 404 (1954) (other citation omitted)).

"[A]rguments that strike at the courts' impartiality, equality, and fairness inflict damage beyond the parties and the individual case under consideration if not corrected." *Penalver*, 256 S.W.3d at 681. To constitute incurable jury argument, the argument must "strike[] at the very core of the judicial process." *Phillips*, 288 S.W.3d at 883. Historically, arguments rising to the level of incurable have included appeals to race, unsupported and extreme personal attacks on witnesses or opposing parties, and accusing an opposing party of manipulating a witness absent evidence of tampering. *Penalver*, 256 S.W.3d at 681; *Reese*, 584 S.W.2d at 840.

Dr. Sarpong testified that children with traumatic brain injuries may suffer developmental and behavioral issues that can take some time to manifest, which is why doctors follow them long-term. Evidence showed Alex had already undergone multiple types of therapy to assist in his recovery from the injuries he sustained and would continue to need it in the future. The record was replete with evidence of Alex's extensive injuries, including broken bones in various stages of healing, subdural hematomas, and retinal hemorrhages, which doctors attributed to repeated instances of child abuse.

Detective Lee acknowledged that Mother lied to them during her initial interview about living with Father. However, he testified she ultimately provided information of Father's conduct toward Alex. Lee explained that Mother told them Alex was fussy, and Father did not like being around him for that reason. Father also

31

questioned whether Alex was his biological child. Lee testified that Mother described Father flinging Alex around by the "scruff of the neck" and punching Alex in the ribs. He also testified that Father demonstrated rolling rapidly back and forth with Alex like an "alligator" and how "they catch hold of their prey in the water, they start turning real fast to go back and forth to drown something" but noted that likely would not cause the skull fracture and brain bleeding. Lee also testified that Father complained during his interview that four-month-old Alex had "anger problems." Lee testified that they charged Father with injury to a child.

Father also testified he did not take Alex to his medical appointments. Father told the jury he had been diagnosed with oppositional defiant disorder and bipolar disorder for which he used to take medications but no longer did. Testimony adduced at trial also showed Father's violent tendencies, which included lying in wait for Intervenor and assaulting him after Intervenor had taken Mother to a shelter, then setting Intervenor's house on fire. Additionally, while Father complains of references to an infamous sports figure, we note that throughout the trial, he used a sports analogy as part of this theme, asking that jurors "leave him on the bench" but not "cut him from the team." *See Reese*, 584 S.W.3d at 839 (noting complaining party must prove argument was not invited or provoked, among other things).

These arguments did not strike at the core of the judicial process. *See Phillips*, 288 S.W.3d at 883. Given the state of the evidence and this record, we are

unconvinced that the offensive argument was so extreme it would have persuaded a juror of ordinary intelligence to agree to a verdict contrary to what he or she would have absent such argument. *See id.* Father failed to meet his burden of showing there was a greater probability that the improper argument caused harm than the verdict was grounded on proper proceedings and evidence. *Reese*, 584 S.W.2d at 839. The trial court did not abuse its discretion in denying Father's Motion for New Trial. We overrule Father's first issue.

## B. Second Amended Petition in Intervention

In his second issue, Father argues the trial court erred by allowing Intervenor to file his Second Amended Petition in Intervention at the time of trial to include the Department's termination grounds. We review a trial court's decision on leave to amend for an abuse of discretion. *See Austin v. Countrywide Home Loans*, 261 S.W.3d 68, 75 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

In the present case, the first day of trial and shortly before voir dire, Intervenor alerted the trial court he wanted to amend his pleadings and adopt the Department's pleadings to include termination in his Petition in Intervention. That same day, Intervenor filed a Motion to Adopt Petitioner's Pleadings Regarding Termination of Parental Rights.[11] Father objected in the trial court and argued that the amendment

---

[11]In substance, this was a motion for leave to amend, and the trial court treated it as such. *See Surgitek, Bristol-Myers Corp. v. Abel*, 997 S.W.2d 598, 601 (Tex. 1999) (explaining courts look to substance of relief sought not merely the title).

was untimely, constituted surprise and prejudice, and he would have changed his strategy had he known Intervenor would also seek to terminate his rights. Father's counsel argued that under Rule 66 an amendment can be allowed if it subserves presentation of the merits of the case, which this does not do, because counsel argued it did not change anything. Finally, Father objected that the Second Amended Petition in Intervention added termination as a new cause of action, which he argued was prejudicial as a matter of law and cited to *Greenhalgh v. Service Lloyds Insurance Company. See* 787 S.W.2d 938 (Tex. 1990). The Department and Intervenor both noted that the jury charge would not change nor would the evidence, so there was no prejudice. The trial court overruled Father's objections and granted Intervenor leave to amend, reasoning that termination was not a new cause of action in this case, it existed through the Department's pleadings, and Father was already defending the same cause of action in the suit. The trial court further explained that it was not unanticipated, Father had appointed counsel to defend against the termination, and there was no prejudice.

Texas Rule of Civil Procedure 66 governs trial amendments and provides that the court may allow pleading amendments and shall do so when the amendment would serve the presentation of the merits without prejudicing an opposing party's action or defense on the merits. *See* Tex. R. Civ. P. 66; *Tanglewood Homes Ass'n, Inc. v. Feldman*, 436 S.W.3d 48, 64 (Tex. App.—Houston [14th Dist.] 2014, pet.

34

denied). Under Rule 66, "a trial court has no discretion to refuse a trial amendment unless: (1) the opposing party presents evidence of surprise or prejudice, or (2) the amendment is prejudicial on its face because it asserts a new cause of action or defense, and the opposing party objects to the amendment." *Feldman*, 436 S.W.3d at 64 (citing *Stephenson v. LeBoeuf*, 16 S.W.3d 829, 839 (Tex. App.—Houston [14th Dist.] 2000, pet. denied)). Mandatory trial amendments are those procedural in nature, such as conforming the pleadings to the evidence at trial. *Id.*; *Stephenson*, 16 S.W.3d at 839. Discretionary amendments are those that change the nature of the trial, and we will only reverse a trial court's decision to allow or deny them if the court clearly abused its discretion. *See Feldman*, 436 S.W.3d at 64.

A proposed trial amendment asserting a new cause of action may be prejudicial on its face, but merely asserting a new cause of action is not prejudicial to an opposing party as a matter of law. *Id.* Rather, to determine prejudice, we evaluate the amendment in the context of the entire case. *Id.* We look at three factors to address whether a trial amendment is prejudicial on its face: (1) it asserts a new substantive matter that reshapes the nature of the trial itself; (2) the new matter is of a nature that the opposing party could not have anticipated considering the development of the case up to the time of the requested amendment; and (3) the opposing party's presentation of its case would be detrimentally affected by the amendment. *Id.* at 64–65. Under this test, we will not reject a discretionary trial

amendment simply because it alleges a new cause of action. *See State Bar of Tex. v. Kilpatrick*, 874 S.W.2d 656, 658 (Tex. 1994). Instead, we look at the three factors above in the context of the entire case to determine whether the trial court abused its discretion. *See Feldman*, 436 S.W.3d at 65; *Stephenson*, 16 S.W.3d at 839.

Father has failed to show that he was prejudiced by Intervenor's trial amendment or that it was prejudicial on its face. Despite his claim of surprise and prejudice, termination was a cause of action in the case from its inception, and the Intervenor's termination grounds were identical to the Department's. It was a cause of action Father already had to defend, no new witnesses were required, and the jury charge did not change. The trial court reasonably concluded it did not reshape the nature of the case. *See Feldman*, 436 S.W.3d at 65. Father also alleges that he could not have anticipated the new matter; however, given the Department's pleaded termination grounds, the acrimonious relationship between Father and Intervenor, Intervenor's first-hand experience with Father's violent tendencies, and that Intervenor sought conservatorship of the children, the trial court's conclusion that this was not unanticipated given the case's procedural posture was reasonable. Finally, the fact that there were no new witnesses or evidence Father had to address or rebut based on the amendment could have likewise led the trial court to reasonably conclude it did not detrimentally impact the presentation of his case. Accordingly, the trial court did not abuse its discretion by allowing the trial amendment. *See* Tex.

36

R. Civ. P. 66; *Feldman*, 436 S.W.3d at 64–65; *Stephenson*, 16 S.W.3d at 839. We overrule this issue.

## V. Conclusion

Having overruled Father's and Intervenor's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
W. SCOTT GOLEMON
Chief Justice

Submitted on September 13, 2022
Opinion Delivered October 6, 2022

Before Golemon, CJ, Kreger and Johnson, JJ.